UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 09-10085-CIV-MARTINEZ
MAGISTRATE JUDGE P.A. WHITE

DANIEL A. SWETOKOS, :

    Plaintiff, :

v. : <u>REPORT OF</u>
<u>MAGISTRATE JUDGE</u>

KEENA ALLEN, ET AL., :

    Defendants. :

_____

## I  INTRODUCTION

In this case, plaintiff Daniel A. Swetokos submitted a <u>pro se</u> civil rights complaint (DE#1, dated 8/8/09 and docketed 8/17/09) pursuant to 42 U.S.C. §1983, seeking monetary and equitable relief for being denied a Vegan Diet, which he began requesting in December 2008, after his arrival at the Monroe County Detention Center ("MCDC"). The diet, he claims, was necessary to the practice of his Buddhist faith. The named defendants are Tommy Taylor, Chief of the Monroe County Bureau of Corrections; Keena Allen, Director of Program Services at MCDC; and Officer Sharee Williams.

As noted in the Preliminary Report (DE#4), Swetokos in his complaint alleges that when he grieved to Chief Taylor, Taylor simply "re-routed" his grievance to Director Allen for response. Swetokos alleged that Allen and Williams had been denying him the vegan diet for many months. **This Cause is before the Court upon plaintiff's Motion for Summary Judgment (DE#28)** with attached Exhibits A-K; **and upon the defendants' joint cross Summary Judgment Motion (DE#57)** with Exhibits A-AE, as to which the plaintiff was advised of his right to respond (DE#58, Order of Instructions).[1]

---

    [1]    Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is proper

    [i]f the pleadings, depositions, answers to interrogatories, and
    admissions on file, together with the affidavits, if any, show that
    there is no genuine issue as to any material fact, and that the mov-
    ing party is entitled to judgment as a matter of law.

    In <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317 (1986), the Court held that summary judgment should be entered only against

    a party who fails to make a showing sufficient to establish the
    existence of an element essential to that party's case, and on which

Swetokos supplemented his exhibits with Exhibit L (DE#51); filed Memo of Law, citing text from the Free Exercise Clause of the First Amendment, and O'Lone v. Estate of Shabazz, 482 U.S. 342 (1987) and Bell v. Wolfish, 441 U.S. 520 (1979), in support of his claims. At DE#63 Swetokos filed a Response with exhibits, opposing the defendants' motion; and Defendants filed a Reply (DE#68).

---

that party will bear the burden of proof at trial.  In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to judgment as a matter of law' because the non-moving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.  (citations omitted)

Thus, in Celotex Corp. v. Catrett, 477 U.S. 317 (1986), the Court held that summary judgment should be entered only against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.  The moving party is 'entitled to judgment as a matter of law' because the non-moving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof. (citations omitted). Thus, pursuant to Celotex and its progeny, a movant for summary judgment bears the initial responsibility of informing the court of the basis for his motion by identifying those parts of the record that demonstrate the nonexistence of a genuine issue of material fact. This demonstration need not be accompanied by affidavits. Hoffman v. Allied Corp., 912 F.2d 1379, 1382 (11 Cir.1990).If the party seeking summary judgment meets the initial burden of demonstrating the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party, to come forward with sufficient evidence to rebut this showing with affidavits or other relevant and admissible evidence. Avirgan v. Hull, 932 F.2d 1572, 1577 (11 Cir.), cert. denied, 112 S.Ct. 913 (1992). It is the nonmoving party's burden to come forward with evidence on each essential element of his claim sufficient to sustain a jury verdict. Earley v. Champion International Corp., 907 F.2d 1077, 1080 11 Cir.1990). The non-moving party cannot rely solely on his complaint and other initial pleadings to contest a motion for summary judgment supported by evidentiary material, but must respond with affidavits, depositions, or otherwise to show that there are material issues of fact which require a trial Fed.R.Civ.P. 56(e); Coleman v. Smith, 828 F.2d 714, 717 (11 Cir.1987). If the evidence presented by the nonmoving party is merely colorable, or is not significantly probative, summary judgment may be granted. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986); Baldwin County, Alabama v. Purcell Corp., 971 F.2d 1558 (11 Cir.1992). "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." Walker v. Darby, 911 F.2d 1573, 1577 (11 Cir. 1990) (citing Anderson v. Liberty Lobby, Inc., supra).

Pursuant to Brown v. Shinbaum, 828 F.2d 707 (11 Cir. 1987), the Order of Instructions (DE#58) was entered to inform the plaintiff Swetokos, as *pro se* litigant, of his right to oppose the defendants' motion for summary judgment filed, and to instruct him regarding the requirements under Fed.R.Civ.P. 56 for a proper response to such a motion.

2

## II   DISCUSSION

### A.   Prayer for Equitable Relief is Moot

Swetokos' prayer for equitable relief, for "Policy Change" and to be "Granted Vegan Diet," is moot on two bases. First, the record demonstrates that Swetokos was granted a Vegan Diet at MCDC starting on December 16, 2009. Second, it shows that Swetokos is no longer incarcerated (Notice, DE#70), and therefore, to the extent that he seeks equitable relief, that portion of his complaint was mooted by his release. An inmate's transfer from an institution or release from custody renders moot claims for injunctive or declaratory relief. See Spears v. Thigpen, 846 F.2d 1327 (11 Cir. 1988); Cotterall v. Paul, 755 F.2d 777, 780 (11 Cir. 1985).

There remains Swetokos' claim for monetary damages, on grounds that he was denied the Vegan diet from his 2008 arrival at MCDC, up to December 15, 2009.

### B.   Motions for Summary Judgment (DE#s 28 and 57)

Plaintiff Swetokos in his motion DE#28 states that his faith [Buddhism] "encourages" him to "maintain a strict vegetarian diet pursuant to First Precept in Buddhism," as illustrated by his Exhibit A, captioned "The Five Precepts." The first precept reads, as follows, *verbatim*:

> **The First Precept**
>
> Aware of the suffering caused by destruction of life, I vow to cultivate compassion and learn ways to protect lives of people, animals, plants and minerals. I am determined not to kill, not to let others kill, and not to condone any act of killing in the world, in my thinking and in my life.

(DE#1, at p.1, ¶1; and Ex.A). Swetokos states that he filed requests/grievances to defendants requesting a vegetarian diet (Id. at ¶2; and Ex.B), and asked kitchen staff to not "cross-contaminate" his meals by allowing meat to touch non-meat items (Id. at p.2, ¶3; and Ex.C). Swetokos states that Director Allen told him he was not a Buddhist, but instead a Christian, despite the fact that classification files and jail records show he was in

3

fact Buddhist, and the jail system had declared him as such. (<u>Id.</u> at ¶4; and Ex.D). He states that "Williams admits Plaintiff's Reverend E-mailed her to verify plaintiff's need for vegetarian diet," but she still denied him that right. (<u>Id.</u> at ¶5; and Ex.E). Swetokos states that Taylor, as Allens' and Williams' supervisor, refused to acknowledge his religious rights, and re-routed a grievance from Swetokos to Allen for response. (<u>Id.</u> at ¶6; and Ex.F). Swetokos states that a vegetarian diet is offered at the MCDC, and that it would not have caused "facility disruption" to provide it to him. (<u>Id.</u> at p.3, ¶7; and Ex. G). He states that he is a member of the Phap Nguyen Buddhist Congregation (<u>Id.</u> at ¶8; and Ex.H), that he was in constant correspondence with Thich Tri Hoang, Abbot of the Phap Nguyen Temple, for guidance and spiritual insight, and regarding the denial of a vegetarian diet. (<u>Id.</u>, at ¶9; and Ex.I). Swetokos further states that he is "a student of Buddhist Association of the United States Correspondence Course," and that "Reverend Richard Baska has dictated Plaintiff's need for vegetarian diet as required in Buddhism." (<u>Id.</u> at ¶10; and Ex.J). Swetokos submits Declarations executed in September, October, and November 2009, from sixteen inmates stating that Swetokos traded food items [particularly meat] with them or other inmates, for vegetable and other non-meat items.[2] (<u>Id.</u>, at ¶11; and Ex.K). Swetokos also submits his own Declaration (at Ex.K), stating that he was introduced to Buddhism in the summer of 1994, but it was "wasn't until later" that he grew to accept the teachings of Buddhism and apply it to his own life. He states that in 2007, at Centrury C.I. inmate Dwayne Brown shared literature from "The Prison Project," which he states is "a center for correspondence" to teach prisoners meditation and the principles of Buddhism, and he and Brown practiced together. Swetokos discusses his growing enlightenment between 2007 and the present; and he states that based on his interpretation/summation of the First Principle (not to kill any living creature), he has chosen not to eat meat because "Buddhists do not kill for food or sport because animals have just

---

[2] The declarants are inmates Beckner, Higgins, Leal, Honeycutt, Krenn, Dieter, Gillette, Gilbride, Lenz, Newton, Simonelli, Ogutu, Shirley, Bowen, Faulkner, and Sanchez.

as much right to life as we (Humans) do on this Earth." In his Motion (DE#28), Declaration (Ex.K), and other Exhibits, Swetokos does not address his health concerns voiced in the complaint.

Swetokos' complaint, motion for summary judgment, and Affidavit, do not thoroughly set out the sequence of events that transpired. The defendants' Motion DE#57 and Exhibits fill in details in chronological order, shedding light on information known to them. They argue that the decisions made by them, guided by existing institutional rules and procedures established to accommodate inmates' religious beliefs while at the same time serving institutional goals or needs, were based on the facts/information as it was provided to them or became known.

In their motion for summary judgment (DE#57), the defendants argue that they are entitled to qualified immunity.

The defendants argue that the mere fact that Swetokos said he was Buddhist, and wanted a vegetarian or vegan diet, alone did not suffice. He, like other inmates, was required to make requests via established procedures, and provide proof of his religious affiliation and need for the diet. It is apparent from the record that the delay in providing the requested diet was due to Swetokos' failure to timely or properly provide required information himself, and lack of information from outside religious authorities [whose names Swetokos provided to MCDC official] needed to confirm Swetokos' religious affiliations and needs.

The complaint has been deemed to raise a claim under the Free Exercise Clause of the First Amendment, subject to analysis under the standard enunciated in Turner v. Safley, 482 U.S. 78 (1987), O'Lone v. Estate of Shabazz, 482 U.S. 342 (1987), and their progeny. (See Preliminary Report, DE#4; and Plaintiff's Memo, DE#61).

The First Amendment's Free Exercise Clause, which has been made applicable to the States through the Fourteenth Amendment, see Cantwell v. Connecticut, 310 U.S. 296, 303 (1940); and Malicki v.

5

Doe, 814 So.2d 347 (Fla. 2002), provides that "Congress shall make no law respecting an establishment of religion, or *prohibiting the free exercise thereof...* " U.S. Const., Amdt. 1 (emphasis added.)

It is well settled that, upon their confinement, inmates do not forfeit all First Amendment rights, including the right to exercise religious practices and beliefs, O'Lone, supra; Bell v. Wolfish, 441 U.S. 520 (1979). The Courts have held, however, that a jail/prison rule may infringe on inmate's First Amendment rights if to do so is necessary to protect legitimate governmental interests, and the rule is no greater than necessary to protect those interests (i.e. if it is not an exaggerated response). Procunier v. Martinez, 416 U.S. 396, 413-14 (1974); Pell v. Procunier, 417 U.S. 817, 822-23 (1974); Turner, 482 U.S. at 87, 89 (the relevant inquiry is whether the prison regulation burdening a fundamental right is reasonably related to legitimate penological objectives of the corrections system, or whether it represents an exaggerated response to those concerns); O'Lone, supra, at 348-49.

An inmate's First Amendment Free Exercise claim is analyzed under Turner/O'Lone "reasonableness" in order to ensure that an appropriate balance is struck between the protection of fundamental rights and the deference owed to jail/prison officials, when determining constitutionality of jail/prison regulations. O'Lone, supra, at 349. An inmate must be accorded reasonable opportunity to practice his religion. However, what constitutes a reasonable opportunity is evaluated with reference to legitimate penological objectives, which include rehabilitation, deterrence and security. Turner, supra; O'Lone, supra, 482 U.S. at 348; Mosier v. Maynard, 937 F.2d 1521 (10 Cir. 1991); McElyea v. Babbitt, 833 F.2d 196 (9 Cir. 1987). Key among such governmental interests forming a legitimate basis for suppression or restriction of inmates' First Amendment rights is the need to maintain institutional order and security. See Bell, 441 U.S. at 550-51; Pell, 417 U.S. at 823.

When applying the Turner/O'Lone standard, factors to be considered in determining whether the "reasonableness" test has been

met include: 1) whether there is a rational relationship between the regulation and the legitimate government interest being asserted; 2) whether the inmates have alternative means to exercise the right; 3) the impact that accommodation of the right will have on the prison system; and 4) whether ready alternatives to the regulation exist which accommodate the right and satisfy the governmental interest. Turner, supra at 89-91; Brunskill v. Boyd, 141 Fed.Appx. 771, 2005 WL 1208632, at **2 (May 10, 2005, 11 Cir. (Fla.)); Fromer v. Scully, 874 F.2d 69 (2 Cir. 1989); Daker v. Ferrero, 475 F.Supp.2d 1325, 1348 (N.D.Ga. 2007). The fourth factor considers whether "a prisoner has pointed to some obvious regulatory alternative that fully accommodates the asserted right while not imposing more than a *de minimis* cost to the valid penological goal." Overton v. Bazzetta, 539 U.S. 126, 136 (2003).[3]

Courts, generally, have found that to deny inmates food that satisfies the dictates of their religion unconstitutionally burdens their right to free exercise of their faith. See e.g. Ford v. McGinnis, 352 F.3d 582, 597 (2 Cir. 2003) (holding that prisoners have a "clearly established" right "to a diet consistent with [their] religious scruples"); DeHart v. Horn, 227 F.3d 47 (3 Cir. 2000) (finding that Buddhist plaintiff whose request for a vegetarian diet was denied because vegetarianism was not an absolute requirement of Buddhism had stated a free exercise claim, and remanding for further factual findings regarding the existence of countervailing penological interests); Love v. Reed, 216 F.3d

---

[3] For the proposition that administrative or monetary costs are also appropriate factors to consider in determining if a chosen means of accommodation is valid, see: Hakim v. Hicks, 223 F.3d 1244, 1247-49 (11 Cir.2000) (applying Turner reasonableness standard, holding that where there was no evidence that doing so would create an administrative or other burden on the DOC or that costs were anything but *de mininis*, it was unreasonable to refuse to add a prisoner's religious name to his ID Card, in addition to his committed name); Lawson v. Singletary, 85 F.3d 502, 508-09 (11 Cir.1996) (citing S. Rep. No. 111, 103d Cong., 1st Sess. 10, U.S.Code Cong. & Admin.News 1993 pp. 1892, 1899-1900)(noting that based on the legislative history of RFRA, Congress expressly assumed that the Courts would apply RFRA in the prison context within the framework of prior case law...that the legislation clearly intended courts to continue to afford deference to the judgment of prison officials ...including "the tradition of giving due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with considerations of costs and limited resources...").

682 (8 Cir. 2000) (holding that denial of inmate's request for bread and peanut butter so that he could prepare his Sunday meals in his cell on Saturday -- thereby avoiding preparing food, or benefitting from the preparation of food by others, on the Sabbath -- violated prisoner's free exercise rights); Makin v. Colo. Dep't of Corr., 183 F.3d 1205 (10 Cir. 1999)(holding that prison officials' failure to accommodate inmate's meal requirements during Ramadan violated his free exercise rights); Bass v. Coughlin, 976 F.2d 98, 99 (2 Cir. 1992) (per curiam) (reaffirming Kahane v. Carlson, 527 F.2d 492, 495 (2 Cir. 1975) (finding that Orthodox Jewish inmate had right to provision of kosher meals)); Harris v. Ostrout, 65 F.3d 912, 918, n.5 (11 Cir. 1995) (observing that the plaintiff's allegation of inadequate diet was a valid constitutional claim; and in doing so, noting that the Court earlier had granted prisoners a limited right to receive a religious diet, in its opinion in Martinelli v. Dugger, 817 F.2d 1499, 1505-06 (11 Cir. 1987), *cert. denied*, 484 U.S. 1012 (1988)).

This acknowledged principle, however, does not mean that in making dietary accommodations, governmental interests including significant administrative concerns and/or monetary costs are not to be considered. In the context of a First Amendment religious dietary claim by an inmate, governmental interests to be balanced against the prisoner's First Amendment right may include: 1) running a simplified food service, rather than one that gives rise to many administrative difficulties, see: Ward v. Walsh, 1 F.3d 873, 877 (9 Cir. 1993); Kahey v. Jones, 836 F.2d 948, 950-51 (5 Cir. 1988) (full kosher diet not required, where administratively unfeasible); and 2) avoidance of excessive administrative expense and prison budget overruns, Ward v. Walsh, supra 1 F.3d at 877; Salaam v. Collins, 830 F.Supp. 853, 859-861 (D.Md. 1993) (cost of providing pork-free diet and lacto-ovo-vegetarian diet would be *de minimis*, but cost of providing Muslims ritually slaughtered meat would be substantial); see also: Martinelli v. Dugger, 817 F.2d 1499, 1507 n. 29 (11 Cir. 1987) (case decided same day as Turner, using pre-Turner analysis).

8

At MCDC and other Monroe County facilities, a food service corporation provides inmate meals, under contract with the Sheriff's Office. (Taylor Affidavit, Ex.D). Meals prepared for each facility from menus approved by a licensed dietician are designed to be bland but nutritious, low in salt and cholesterol, and high in protein. In order to ensure uniform, expeditious service of food at the jails, all inmates at the jails are given the same food, with the exception of religious or medical diets. (Id., Ex.D).

The Monroe County Detention Policy, No. 6:018 (Ex. D-1, at DE#57-4, pp.4-8) was established to ensure that inmates are permitted to practice the religion of their choice, provided that it does not constitute a security breach. (Id.). The MCDC recognizes that dietary restrictions apply to certain religions, and to accommodate their beliefs inmates are permitted to submit requests for religious diets. (Id.). While the cost of each special meal, whether it is vegetarian, Vegan, or Kosher is the same as a regular meal [$1.23], the Policy provides that such special meals requested on a religious basis will only be provided to inmates who are members of an organized religious group requiring adherence to religious dietary laws. Prior to approval of a religious dietary request, the inmate's affiliation with the recognized group and its dietary requirements must be verified by the Programs Staff Assistant. (Id.). At the time that Chief Taylor's Affidavit was executed on 2/3/2010, there were 7 inmates at MCDC, including inmate/plaintiff Swetokos, who were receiving religious diets. (Id.).

Under the Policy No. 6:018, the inmates are instructed via the inmate Handbook that if their faith requires a special diet they are to write to the Programs Department and provide the name of their religion, and provide the name and phone number of a contact person who can verify the inmate's religious affiliation and that the religion requires a special diet. (Taylor Affidavit). The inmates are told that the contact person will be called to obtain the necessary verifications. (Id.). The purpose of the policy is not to hinder or burden any inmate's religious practice. Instead, the verification of the inmate's religious affiliation, and the

dietary requirements associated with it, "is necessary to maintain a smooth operation of the jail, and to prevent abuse of the food services process by the inmates." (Taylor Affidavit).

### **Defendant Taylor**

First, with respect to the defendant Chief Taylor, it is apparent that he is entitled to judgment in his favor. It is alleged in the complaint (DE#1) and stated by the plaintiff at deposition (DE#57-1, Ex.A, T/24, 26) that Swetokos directed one grievance to Taylor after requests for a religious diet had been denied by Williams and Allen, and Taylor re-routed the grievance back to Director Allen for further response.

Taylor, Chief of Monroe County Bureau of Corrections, holds a supervisory position. The record does not reveal that Taylor was personally involved in the process of gathering information and processing (granting/denying) Diet requests by the plaintiff. His referral of a grievance to Director Allen at the plaintiff's jail facility for response, who along with Officer Williams was involved in handling/processing the administrative requests, does not form a basis for §1983 liability against Taylor. It has long been established that public officials in supervisory positions cannot simply be held vicariously liable for the acts of their subordinates. Robertson v. Sichel, 127 U.S. 507 (1888); Jasinski v. Adams, 781 F.2d 843 (11 Cir. 1986); Byrd v. Clark, 783 F.2d 1002, 1008 (11 Cir. 1986); Fundiller v. City of Cooper City, 777 F.2d 1436 (11 Cir. 1985). Nor can liability be predicated solely upon the doctrine of respondeat superior in a §1983 action. Monell v. Department of Social Services, 436 U.S. 658 (1978); Vineyard v. County of Murray, Georgia, 990 F.2d 1207 (11 Cir. 1993).

In addition, the plaintiff cannot proceed on a claim that Taylor failed to act favorably on his grievance. The Constitution does not entitle prisoners and pretrial detainees in state or federal facilities to grievance procedures, Adams v. Rice, 40 F.3d 72, 75 (4 Cir. 1994), cert. denied 514 U.S. 1022 (1995); Buckley v. Barlow, 997 F.2d 494, 495 (8 Cir. 1993); Flick v. Alba, 932 F.2d

10

728, 729 (8 Cir. 1991); Stewart v. Block, 938 F.Supp. 582, 588 (C.D. Cal. 1996); Brown v. Dodson, 863 F.Supp. 284, 285 (W.D. Va. 1994); and since even if a grievance mechanism has been created for the use of states inmates the mechanism involves a procedural right, not a substantive one, and it does not give rise to a liberty interest protected by the Due Process Clause, Antonelli v. Sheahan, 81 F.3d 1422, 1430 (7 Cir. 1996); Hoover v. Watson, 886 F.Supp. 410, 418 (D. Del. 1995); Brown v. Dodson, supra at 285; and thus, if the state elects to provide a grievance mechanism, violations of its procedures, or even a failure to respond to the prison grievance, do not give rise to a §1983 claim, Buckley v. Barlow, supra, 997 F.2d at 495; Hoover v. Watson, supra, 886 F.Supp. at 418-19. When the claim underlying the administrative grievance involves a constitutional right, the prisoner's right to petition the government for redress is the right of access to the courts, which is not compromised by the prison's refusal to entertain his grievance. Flick v. Alba, supra, 932 F.2d at 729.

### **Williams and Allen**

While Swetokos complains he was denied a vegetarian or vegan diet starting upon his arrival at MCDC in December 2008, and had not yet received it by the time his complaint was submitted in August 2009 and his summary judgment motion was filed on December 7, 2009, the record shows that his requests for dietary accommodation were not ignored. Rather, grievances and requests were addressed, and jail authorities made numerous attempts to gather information from Swetokos himself, and from outside religious authorities or Organizations to whom Swetokos referred them.

There were indications which would lead MCDC officials to reasonably believe that Swetokos in December 2008 was not Buddhist. At his 11/12/09 deposition, Swetokos stated that he had been practicing Buddhism since November 2007, but records from October 2007 maintained by the Florida DOC where Swetokos had previously been confined listed him as Roman Catholic, (Ex.C), and when he was booked at the MCDC on 12/10/08, the Intake papers signed by Swetokos listed him as Christian (Ex.B). Two weeks after his

arrival, Swetokos on 12/23 asked the MCDC Chaplain for a Bible and copy of "Our Daily Bread Devotional," and on 12/24 requested a "decent bible" so the he "could learn scripture." (Requests, Exs. E and F). [Swetokos, in his March 2010 Response to Defendants' cross motion, states that the Bible request was so that he could engage in cross-referencing when using his "Seeker's Glossary of Buddhism" that refers to certain Bible passages. see DE#63, p.6, ¶13]. Next, on 1/4/09, he asked for a Kosher diet application (Request, Ex.G) which Williams provided and directed him to return; but on 1/5/09 Swetokos instead completed the form, requesting a Vegan diet, and listing the address and phone for Rev. Adriene Baksa as his religious contact (Ex.H). Messages were left for Rev. Baksa, Swetokos made a follow up request to MCDC on 1/8 asserting that he had been practicing Buddhism for 7 years and had been on a Vegan diet for a very long time. Baksa could not be contacted, and ultimately on 1/23 Swetokos' diet request was denied because it could not be shown he was Buddhist, and the MDCC record [signed by him] indicated he was Christian. (Exs. H-L). On 1/23/09 Swetokos wrote the Programs Department to request a change of his record from Christian to Buddhist (Ex.M), and Williams told him to send the change request to the Records Department (Id.). His MCDC record was changed to show Buddhist (see 2/1/09 Response to Request, Ex.N). Swetokos and Williams both were unsuccessful in reaching Rev. Baksa (Ex.O). Then, on May 9, 2009 Swetokos filed another Request, but this time for a Vegetarian Diet (Ex.P), listing Rev. Trich Tri Hoang as his religious contact. (Id.). After unsuccessful attempts to reach Rev. Hoang to confirm Swetokos' Buddhist affiliation, Williams denied his 5/9 request on 5/27/09 (Exs. P, Q).

Then, on 7/2/09, Rev. Baksa E-mailed Williams to say there was no record of contact between Swetokos and his organization (Ex.R). Baksa's E-mail also said that while Buddhists are strongly encouraged not to eat meat because killing violates the First Precept, the requirement of Vegetarianism was not mandatory. Baksa stated that some Buddhists abstain totally, others do so one or more days a week, and yet others abstain only on Buddhist holy days. (Id.).

12

On 7/10/09 Swetokos submitted another Vegan Diet Request (Ex.S), but since Rev. Hoang was unable to confirm Swetokos' affiliation with his Buddhist organization, Allen denied that request on 7/15/09. (Id.). Then on 7/28 Rev. Hoang sent Williams an E-mail of apology, stating that he was mistaken, and that on 3/4/09 Swetokos had, indeed contacted his organization (Buddhist Association of the United States ("BAUS")) to request information about it. The organization's records also showed that Swetokos had told them on 4/3/09 that he was registered as a Buddhist at Monroe County. (Id.). This E-mail did not confirm membership by Swetokos in a Buddhist congregation, including the BAUS.

On October 6, 2009, Swetokos made another application, this time for a Vegetarian diet, again listing Rev. Hoang as his contact. (Ex.U). Williams called the number provided by Swetokos for Hoang several times on 10/7, to no avail, always receiving a busy signal; and therefore, this, Swetokos' fourth dietary request, was denied by Williams on 10/7/09. Williams, wrote in her response to Swetokos, that review of his file indicated he had made religious diet applications on several occasions, and that each was denied. Williams' response instructed: "Please do not apply again." (Ex.U).

Swetokos admitted at Deposition in January 2009 that he was not a member of a Buddhist organization on 9/25/09, as he had only on that date sent an application for membership (Ex.A, DE#57-1, Depo at T/31). The record shows that on October 22, 2009, a Certificate of Membership was finally issued by Rev. Hoang, certifying that Swetokos was a member of the Pap Ngyyen Buddhist Congregation since October 8, 2009. The record indicates that that information had not been provided to the defendants, and came to their attention when Swetokos' Summary Judgment Motion (DE#28, docketed 12/7/09) included a copy of the 10/22/09 certificate as an exhibit (Ex.H, DE#28 at p.31) [which defendants indicate they received through that filing on December 14, 2009].

It is undisputed that on December 16, 2009, Swetokos was approved for a religious based vegetarian diet at MCDC.

### **The First Amendment Free Exercise Claim**

Swetokos has argued that the defendants should simply have believed his statements that he was a practicing Buddhist, and that it would have been no burden on the institution to provide him Vegan food since the cost of it and a regular meal is the same.

The process encompassed in the MCDC Policy, requiring declaration of the inmate's religious preference, and an outside religious authority's confirmation of the inmate's religious affiliation, and of the religion's dietary requirements, and making provision of the special diet contingent upon such verifications, is clearly rationally related to a legitimate governmental interest of maintaining a streamlined food service process, and to prevent abuses by inmates who otherwise might demand special diets based on their non-medical or non-religious food preferences.

In sum, although Swetokos, as an inmate holding an affirmed and confirmed belief in a religious faith may be entitled to a religious diet while incarcerated, that right was not unfettered and was appropriately subject to receipt of proper documentation, which Swetokos and the non-institutional leaders to whom Swetokos referred the defendants, did not provide. Swetokos' August 2009 Complaint (DE#1) complained he had been denied a religious Vegan diet since arriving at MCDC in December 2008. But Swetokos did not apply for membership in Rev. Hoang's Buddhist organization until 9/25/09, 6 weeks after he signed the complaint, and Swetokos' membership in the Pap Ngyyen Buddhist Congregation, which began on 10/8/09, was not certified by Reverend Hoang until 10/22/09. Thereafter, with Swetokos' inclusion of Rev. Hoang's 10/22/09 Certificate as a Summary Judgment Exhibit H in December 2010, the defendants had their first authenticated notice that he was a practicing Buddhist, and on December 16, 2009, Swetokos' previously stated desire for a religious vegan/vegetarian diet was granted.

It is clear that the defendants' actions did not amount to a violation of Swetokos' First Amendment rights. It was appropriate

for the MCDC administration to look into the sincerity of Swetokos' religious belief, in conjunction with his request for special religious dietary accommodations. See DeHart v. Horn, 227 F.3d 47, 52 (3 Cir. 2000) ("...if a prisoner's request for a particular diet is *not* the result of sincerely held religious beliefs, the First Amendment imposes no obligation on the prison to honor that request, and there is no occasion to conduct the Turner inquiry. *It is in this way that prisons are protected from random requests for special diets by inmates whose alleged dietary restrictions are not the result of their religious convictions but rather their secular predilections* [emphasis added]"). See also Martinelli v. Dugger, supra, at 1504 (it is appropriate to determine whether an inmate's belief is "truly held"). Swetokos was not deprived of other ways of practicing his religion, for example engaging in meditation or prayer, and following the Precepts to the extent possible within the prison environment during his daily life. The defendants, through Taylor's Affidavit have proffered that the reason for the Policy requiring an outside contact's [religious leader's] confirmation both of an inmate's religious affiliation and of the designated religion's dietary requirements, is for the purpose of maintaining institutional order with regard to the provision of meals, by preventing abuse of the food services process by inmates. Clearly, if one MCDC inmate were permitted to request a special diet, based on faith, without some proof of his religion, it could open a floodgate allowing many other inmates to do the same. In this case, if Swetokos had a confirmable membership/affiliation with a Buddhist organization/congregation in December 2008 when he arrived at MCDC, all he had to do was submit a religious diet request with the phone number of his Buddhist contact, and he could have had the vegan diet a year before it was provided to him. It does not appear that, in order to serve this simple procedural process [policy/regulation] designed to accommodate inmates' religious beliefs while simultaneously serving the need for institutional order and smooth operation of the jail and its food service, there was any ready alternative to the MCDC policy that was enforced by the defendants. See Turner and O'Lone, supra.

Moreover, it is apparent that on the First Amendment Free Exercise claim raised against them, the defendants are entitled to qualified immunity. The qualified immunity defense, invoked here by the defendants, protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Priester v. City of Riviera Beach, 208 F.3d 919, 925 (11 Cir.2000).[4] Computer assisted research fails to disclose the existence of case law clearly establishing that delay by jail or prison officials, occasioned by their actions to verify the inmate/plaintiff's religious affiliation and associated dietary needs, constitutes a First Amendment violation.

### Food Intake

It is undisputed that between December 2008 and December 2009, Swetokos engaged in trading food with other inmates, giving them meat items from his trays for other foods on theirs. (see Inmates'

---

[4] A constitutional right is clearly established if the law at the time of the incident gave officials fair warning their behavior was unlawful. Hope v. Pelzer, 536 U.S. 730, 741 (2002). Law is "clearly established" for qualified immunity purposes by decisions of the United States Supreme Court, Eleventh Circuit Court of Appeals or the highest state court. Wilson v. Strong, 156 F.3d 1131, 1135 (11 Cir. 1998). To show that an official is not entitled to immunity, the plaintiff must point to earlier case law that is "materially similar...and therefore provided clear notice of violation," or to "general rules of law from a federal constitutional or statutory provision or earlier case law that applied with obvious clarity to the circumstances" and clearly established the conduct was unlawful. Trammell v. Thomason, 2009 WL 1706591 at *5 (11 Cir. 2009)(quoting Long v. Slaton, 508 F.3d 576, 584 (11 Cir. 2007)).

When faced with a question of qualified immunity, the Courts pursuant to Saucier v. Katz, 533 U.S. 194, 199-200 (2001), receded from in part by Pearson v. Callahan, 129 S.Ct. 808 (2009), until recently engaged in rigid a two-step analysis: first asking [taking the facts in the light most favorable to the plaintiff/non-movant] whether the official's alleged conduct violated the plaintiff's constitutional rights, and then proceeding, if necessary, to a second question, whether the right was clearly established at the time of the conduct. If the court, addressing the questions in the sequence set out in Saucier, first determines that no constitutional violation occurred, the inquiry ends there. If, however, the alleged conduct amounts to a constitutional violation, the Court then asks whether the right was clearly established at the time of the conduct. Following the Supreme Court's recent opinion in Pearson v. Callahan, 129 S.Ct. 808 (2009), the Saucier two-step analysis is no longer an inflexible progression. Post-Pearson, courts are now free to address/answer the second step first.

16

Affidavits, at DE#28; and inmates' depositions at Exs. V-AC, attached to DE#57).

Swetokos alleged in his complaint that he was "forced to go against my religious beliefs in order to be nourished and survive." The record [inmate witness depositions] indicates, however, that he was never seen to eat meat in violation of his professed religious belief [membership in which had not been documented to MCDC officials until December 2009 when plaintiff's Summary Judgment motion was filed]. In his complaint (DE#1), Swetokos asserted that "I have lost weight, and I feel that my health may be come a concern because I'm not getting adequate nutrition."

At his 1/18/10 deposition, however, he stated that he had gained weight, explaining that his food trading had resulted in an increased intake of sweets and other carbohydrates (cookies, bread, etc) (DE#63, depo, T/35). He testified that on arrival at MCDC he weighed his ideal weight of 170-172 (T/35). When asked if his booking sheet showed him at 190 lbs, he responded stating that he had just gone to medical, and weighed 184 (T/36). Swetokos was asked what physical damages he had sustained, and he responded that he had lost teeth, had a "huge sinus infection," that he is "missing teeth now." (T/35). He stated that he also suffered from irregularity [having to "go to the bathroom all the time"] and sometimes diarrhea, which he attributes his "body not being accustomed to" eating bread and cookies all the time. (Id.) He testified that he asked the kitchen not to let meat touch his other foods (T/36). He states that he suffered cavities, but could not remember any medical personnel telling him that any tooth loss or his sinus infection was due to eating more sweets, or lack of proper nourishment (T/37-38). He did not remember ever complaining to the medical unit about gaining weight (T/39). Swetokos also testified that he has to "gum my food because I'm missing all my molars." (T/47).

With her Affidavit attached to the defendants' summary judgment motion (Ex.AE, at DE#57-31), Elizabeth MacGard, the Health

17

Services Administrator at MCDC, has submitted the plaintiff's medical record from 12/10/08 to 12/15/09 (DE#57-31, at pp. 5-47, and DE#57-32). MacGard states that her review of Swetokos' medical records establishes that between those dates he did not make verbal or written complaints to medical, of having any health issues directly caused by his diet. Swetokos never complained of not having a proper daily caloric intake, nutrients, or of losing or gaining weight due to his diet. His dental records reflect that during his stay at MCDC he was treated for one broken tooth, and had one tooth extracted due to decay. The dental records, however, do not indicate that the tooth extraction or the tooth fracture were a result of his diet. MacGard also states in her Affidavit that the record of Swetokos' 12/15/09 Annual Physical shows that on that date he denied having any health problems. (Ex.AE).

A medical document captioned "Admission Data," dated and signed by medical staff and by Swetokos on 12/17/08, is a report incorporating results of a physical exam and oral medical history, taken of Swetokos upon his arrival at MCDC. It reflects that he had a history of tooth problems. (DE#57-31, p.6). His December 2009 History and Physical Exam (Id. at pp. 7-9) indicates that he weighed 185 lbs, that he had no weight loss (listed under TB Symptoms, Id. p.7), that he had no gastrointestinal problems (Id., p.8), that the only remarkable issue was a fluid filled eruption on his upper left arm, that he reported having for 1½ years. The Report specifically notes "IM [inmate] denied any health problems" (Id., p.8). Both the interviewing nurse and the inmate/plaintiff signed the report (Id., p.9).

There is nothing to indicate that the defendants who are MCDC correctional staff, [or prison medical staff who were not named as defendants in this suit] were aware of any serious health issues that Swetokos could have been suffering as a result of the food he was provided, or the dietary choices he was making. Therefore, even if the complaint were construed at this juncture to incorporate a medical claim associated with the alleged denial of the Vegan diet commencing in December 2008, the claim would fail, in the absence

of evidence that they were deliberately indifferent to plaintiff's serious medical needs.[5]

### III   CONCLUSION

It is therefore recommended that: 1) Plaintiff's Motion for Summary Judgment (DE#28) be DENIED; 2) the defendants' joint Motion for Summary Judgment (DE#57) be GRANTED as to all claims and defendants; and 3) this case be CLOSED.

Objections to this report may be filed with the District Judge within fourteen days of receipt of a copy of the report.

Dated: June 7th, 2010.

_____
UNITED STATES MAGISTRATE JUDGE

---

[5] Deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eight Amendment. Estelle v. Gamble, 429 U.S. 97, 104 (1976). Whether an inmate's medical need requires attention as a matter of constitutional right depends upon its severity. See Estelle, supra, at 104-06. Generally, a serious medical need is considered "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Farrow v. West, 320 F.3d 1235, 1243 (11 Cir. 2003) (quoting Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1187 (11 Cir. 1994)). It is well settled that a showing of mere negligence, neglect, or even medical malpractice is insufficient to recover on a §1983 claim. A showing of conscious or callous indifference is required. Estelle, supra, 429 U.S. at 104-06; Daniels v. Williams, 474 U.S. 327 (1986); Farrow, supra, 320 F.3d at 1243; Brown v. Hughes, 894 F.2d 1533, 1537-38 (11 Cir. 1990); Washington v. Dugger, 860 F.2d 1018, 1021 (11 Cir. 1988).

As the Eleventh Circuit has noted, even proof that the defendant should have perceived a risk, but did not, is insufficient. Campbell v. Sikes, 169 F.3d 1353, 1364 (11 Cir. 1999)(citing Farmer v. Brennan, 511 U.S. 825, 838 (1994); Cottrell v. Caldwell, 85 F.3d 1480, 1491 (11 Cir. 1996)(the official must have a subjectively "'sufficiently culpable state of mind,'" and "[t]here is no liability for 'an official's failure to alleviate a significant risk that he should have perceived but did not...'") (quoting Farmer, supra, 511 U.S. at 834, 838). Liability may be imposed for deliberate indifference only if the plaintiff proves the defendant actually knew of "an excessive risk to inmate health or safety" and disregarded that risk." Campbell, supra, at 1364 (citing Farmer, at 837).

```
cc:   Daniel A. Swetokos , Pro Se
      13052 Drayton Drive
      Spring Hill, FL 34609


      Adriana M. Jisa, Esquire
      Purdy, Jolly, Giuffreda & Barranco, P.A.
      2455 East Sunrise Blvd., Suite 1216
      Fort Lauderdale, FL 33304
```